UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

**CODY LUKAS and JUSTIN SIMPSON,**

          Plaintiffs,

v                                    Case No.: 2:25-cv-10432

                                   Hon.

**AIMEE BRIMACOMBE**

          Defendant.

| **COMPLAINT AND JURY DEMAND** |
| --- |

_____

Patrick William O'Keefe (P59324)
Nathaniel P. Pfeiffer (P87830)
Attorneys for Plaintiff
O'Keefe Law, PLLC
7804 Francis Ct., Ste 210
Lansing, MI 48917
(517) 253-0114
patrick@okeefelaw.net
nathaniel@okeefelaw.net

_____

## COMPLAINT AND JURY DEMAND

      NOW COME Plaintiffs, by and through their attorneys, O'KEEFE LAW, PLLC, and for their Complaint against the above-named Defendant, state as follows:

## INTRODUCTION

      1.     This is a civil action for relief for injuries sustained by Plaintiff Cody Lukas and Plaintiff Justin Simpson ("Plaintiffs") as a result of the acts, conduct, and commissions by Defendant Aimee Brimacombe.

2.     This civil action seeks to redress the results of a malicious abuse of power by a public official acting under color of law.

3.     Plaintiffs are both police officers with the Michigan State Police (MSP), while Defendant is a high-ranking Deputy Director (Lt. Colonel) in the Michigan State Police.

4.     Defendant disagreed with how Plaintiffs exercised their discretion during a traffic stop with suspect Jacob Long.

5.     Defendant was privately contacted by her friend Tiffany Homola (sister of Jacob Long) who reached out to make a complaint against Plaintiffs for excessive force.

6.     Defendant initially responded appropriately by reporting the matter to MSP's Professional Standards Section (PSS) for an internal investigation, but rather than stepping back and allowing the appropriate department to handle the issue, Defendant chose to remain actively involved due to her own personal opinions on the matter.

7.     At that time Defendant was employed by MSP as a Specialist/First Lieutenant assigned to the Risk Management division, which oversaw civil litigation involving MSP.

8.     The resulting gross miscarriage of justice was brought about by the egregious misconduct of Defendant who chose to leverage her power and authority to pressure the local prosecutor into issuing criminal charges against Plaintiffs after the prosecutor initially declined to do so after reviewing the report from MSP's 1st District Special Investigations Section (SIS).

9.     When Defendant exercised her influence to coerce the prosecutor to issue charges, she was acting under color of law.

10.     Defendant, who is also a licensed attorney, identified herself as a high-ranking member of MSP and used her influence and legal skills to convince the prosecutor to charge Plaintiffs despite a woeful lack of evidence.

11.    As a result of Defendant's initiation of criminal charges, Plaintiffs not only faced suspension from MSP, but they were also exposed to mental anguish, humiliation, and fear arising from the charges.

12.    Although the charges were ultimately dismissed due to a lack of probable cause, Plaintiffs continue to face this burden due to the public smear campaign that they faced.

13.    Plaintiffs also faced the potential threat of being added to a Brady/Giglio list and losing all credibility gained in their career as law enforcement officers.

14.    Defendant shattered Plaintiffs constitutional right to be free from arrest without probable cause—as guaranteed by the Fourth Amendment—because of her desire to prosecute them due to her personal opinions about how they handled the arrest of their suspect.

15.    Plaintiffs continue to fear as though they are walking on eggshells as a result of Defendant's actions due to an ongoing fear of reprisal and a lack of confidence in the protections afforded to them by the Fourth Amendment.

16.    Defendant not only allowed her subjective opinions to cloud her judgment, but she also spearheaded the Plaintiffs' prosecution out of a desire to help enrich her friend's brother, who received a million-dollar settlement authorized by none other than Defendant herself.

17.    Justice Robert H. Jackson is often recognized for the phrase "the process is the punishment," which relates to the burden, oppression, and humiliation that the legal process itself can cause even if the accused is ultimately declared as being innocent of any criminal malfeasance.

18.    As an attorney herself, Defendant is well aware of the burden that criminal proceedings can cause, yet she still attempted to weaponize the process of the prosecution itself to demonize Plaintiffs and further enrich the suspect because his sister and Defendant were friends.

19.     Plaintiffs therefore demand justice. Plaintiffs claim damages well in excess of $75,000 and request a trial by jury in order to ensure that Defendant be held accountable for her malicious abuse of power.

## JURISDICTION AND VENUE

20.     This action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.

21.     Jurisdiction is founded upon 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

22.     Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim occurred in Shiawassee County.

## PARTIES

23.     Plaintiff Lukas resides in the city of Lapeer, Lapeer County, Michigan.

24.     Plaintiff Simpson resides in the city of Birch Run, Saginaw County, Michigan.

25.     At all times relevant hereto and in all their actions described herein, Plaintiffs were employed as Michigan State Police troopers.

26.     Defendant Brimacombe resides in Shiawassee County, Michigan.

27.     Defendant's principal place of business is located at Michigan State Police Headquarters, 7150 Harris Dr., Dimondale, Eaton County, Michigan.

28.     Defendant was, at all times relevant hereto and in all her actions described herein, duly employed by Michigan State Police as a Lieutenant in the Risk Management section.

29.     At all times relevant hereto and in all her actions described herein, Defendant acted under color of law.

**FACTS**

30.     The events giving rise to this cause of action primarily occurred in Shiawassee County, Michigan.

31.     On or about August 24, 2022, through May 22, 2023, Defendant met privately with the Shiawassee County Prosecutor on at least one occasion to request an investigation, alleging that Plaintiffs—both Michigan State Police (MSP) troopers—committed misconduct in office and assault/assault and battery against a citizen during the line of duty.

32.     As a result of Defendant's secret meetings with the elected Prosecutor, Plaintiffs were charged criminally for their involvement stemming from an arrest of a non-compliant suspect on August 24, 2022.

33.     After the incident occurred, the suspect's sister—using *Facebook*—sent a message to Defendant directly using *Facebook Messenger*.[1] *(See PEX Tr., Vol. I, pp 99:17-24, 107:18-23; Exhibit 1)*

34.     Both the suspect's sister and Defendant were acquainted with one another in a personal capacity. *(See PEX Tr., Vol. I, pp 99:10-17, 107:9-11; Exhibit 1)*

35.     The suspect's sister alleged that the Plaintiffs used excessive force against her brother on August 24, 2022. *(See PEX Tr., Vol. I, pp 99:22–100:5; Exhibit 1)*

36.     Originally, in accordance with Michigan State Police Official Order 02-01 (Reporting Dereliction of Duty/Violations of Law), Defendant notified MSP's Professional Standards Section about the allegations. *(See PEX Tr. Vol. 1, pp 100:9-24, 108:11-14; Exhibit 1)*

---

[1] A complete copy of Plaintiff Lukas's Preliminary Examination Transcript – Volume I (66th District Court Case No. 23-ST0293-FY) is attached as *Exhibit 1*, and a complete copy of Plaintiff Lukas's Preliminary Examination Transcript – Volume II (66th District Court Case No. 23-ST0293-FY) is attached as *Exhibit 2*.

37.     However, rather than leaving the investigation to the criminal investigations section, Defendant unilaterally inserted herself into the criminal investigation and actively leveraged the prosecutor to bring criminal charges against Plaintiffs.

38.     Defendant also is a licensed attorney in the state of Michigan. *(See PEX Tr. Vol. I, p 98:13-20; Exhibit 1)*

39.     During relevant times, Defendant was responsible for teaching at the MSP Training Academy and was in charge of the Department's Civil Litigation division. *(See PEX Tr. Vol. I, pp 98:21–99:3, 101:17-22; Exhibit 1)*

40.     At that time, Defendant was employed in MSP's Risk Management division as a Specialist First Lieutenant. *(See PEX Tr. Vol. I, pp 97:6–98:8; Exhibit 1)*

41.     Defendant was not and had never been employed as a detective in her more than 25 years with MSP. *(See PEX Tr. Vol. I, pp 97:6–98:8; Exhibit 1)*

42.     Defendant lodged her complaints against Plaintiffs with MSP's Professional Standards Section (PSS), also known as internal affairs. *(See PEX Tr. Vol. I, pp 100:9-24, 102:21-25; Exhibit 1)*

43.     MSP's PSS assigned the investigation to the Special Investigations Section (SIS) at MSP's First District.

44.     The First District SIS Lieutenant assigned the investigation to one of his Detective Sergeants, D/Sgt. Isaac Mills. *(See PEX Tr. Vol. I, p 14:5-10; Exhibit 1)*

45.     D/Sgt. Mills attempted to interview the suspect (Jacob Long), but Mr. Long was uncooperative and refused to make a statement. *(See PEX Tr. Vol. I, pp 17:13-25, 20:10-17; Exhibit 1)*

46.     MSP's First District submitted a request for review to the Shiawassee County Prosecutor, Scott Koerner. *(See PEX Tr. Vol. II, p 6:9-11, 6:16-18; Exhibit 2)*

47.     An MSP request for review is not a request for criminal charges, but rather a request for review as to whether there is probable cause to believe the trooper(s) committed crimes in the line of duty.

48.     Around that time, Trooper Chad Sheldon's wife, Madison Sheldon, worked as an administrative assistant in the Shiawassee County Prosecutor's Office.

49.     Prosecutor Koerner stated he was getting pressure from "Lansing" to issue criminal charges against Plaintiffs.

50.     Before the issuance of criminal charges against Plaintiffs, Ms. Sheldon witnessed the Defendant meeting with Prosecutor Koerner in his office behind closed doors.

51.     Assistant Prosecuting Attorney Michael Szappan informed Plaintiff Lukas that the matter was submitted to the Prosecutor's office for review only.

52.     Szappan stated that the file was in the "closed" bin, which means that charges against Plaintiffs were going to be denied.

53.     After Defendant met with Mr. Koerner behind closed doors, Koerner removed the file from the "closed" bin and issued criminal complaints against Plaintiffs.

54.     Out of pressure from the Defendant to prosecute, Koerner charged Plaintiff Lukas with Misconduct in Office (a felony) and Assault and Battery (a misdemeanor). A copy of Plaintiff Lukas's criminal complaint is attached as *Exhibit 3.*

55.     In a separate complaint, Koerner also charged Plaintiff Simpson with Assault and Battery, a misdemeanor. A copy of Plaintiff Simpson's criminal complaint is attached as *Exhibit 4.*

56.     As a result of Defendant's malicious actions, Plaintiffs were suspended indefinitely by MSP pending the outcome of the criminal cases.

57.     Upon information and belief, Defendant wanted Plaintiffs prosecuted, imprisoned, and terminated from their employment for arresting her friend's brother.

58.     At a retirement party approximately three weeks after Plaintiffs' suspensions, Defendant told Trooper Andrew Ager that Plaintiffs' traffic stop of Jacob Long on August 24, 2022, was "consensual," and stated Plaintiffs had "no reason to put their hands on" Long.

59.     Prior to Defendant's meeting with the Prosecutor, former F/Lt. Yvonne Brantley (Plaintiffs' post commander) spoke with Prosecutor Koerner about the investigation.

60.     Koerner informed former Lt. Brantley that he was not going to charge Plaintiffs criminally.

61.     But approximately two weeks before Plaintiffs were charged criminally, Defendant called Lt. Brantley and informed Brantley that Prosecutor Koerner was "definitely going to charge" Plaintiffs criminally.

62.     Defendant also told Brantley that the reason Plaintiffs would be charged criminally is because they had no right to put their hands on the suspect.

63.     Defendant said something to the effect of, "Fuck the kick, fuck the punches…(Plaintiffs) had no right to put their hands on (the suspect)."

64.     On or about February 20–27, 2023, when asked how Defendant knew Plaintiffs would be charged criminally, Defendant stated she had a "friend in the (Prosecutor's) office" whom she "spoke to on a regular basis."

65.     On information and belief, the friend to whom Defendant referred was Prosecutor Scott Koerner.

66.     On March 16, 2023, Prosecutor Koerner authorized arrest warrants and criminal charges against the Plaintiffs.

67.     Plaintiff Lukas was charged with Misconduct in Office (felony, punishable by up to five years in prison) and Assault and Battery (misdemeanor, punishable by up to 93 days in jail).

68.     Plaintiff Simpson was charged with one count of Assault and Battery (misdemeanor, punishable by up to 93 days in jail).

69.     On March 17, 2023, Plaintiffs were forced to turn themselves in on the outstanding warrants.

70.     Plaintiffs were arraigned that same day.

71.     After Plaintiffs were arraigned on criminal charges, they were suspended indefinitely, pending the outcome of the criminal case.

72.     Plaintiff Simpson was suspended with pay, whereas Plaintiff Lukas was suspended without pay because he had been charged with a felony.

73.     After Plaintiffs retained former F/Lt. Thomas DeClercq as a consultant/investigator to assist in their criminal defense, former Lt. DeClercq reached out to MSP's resident expert on use of force, Sgt. Justin Mazur.

74.     Mazur informed DeClercq that he could not speak to Mr. DeClercq per orders from "Risk Management" (Defendant).

75.     This deprived the Plaintiffs of a fair opportunity to have their use of force reviewed by someone who taught defensive tactics.

76.     Again, the head of Risk Management at that time was none other than Defendant.

77.     Defendant silenced a key witness who may have assisted Plaintiffs in their defense.

78.     Additionally, after receiving some flak from the law enforcement community, Prosecutor Koerner informed MSP Sgt. Evan Neilson that Koerner "backed the Blue".

79.     Koerner advised Sgt. Neilson that he did not want to charge the Plaintiffs criminally, but he was getting "pressure from Lansing."

80.     To the best of Plaintiffs' information, knowledge and belief, Defendant was the only person applying political pressure from Lansing.

81.     Defendant's office at MSP was located in Lansing (Eaton County) at the time, and it is currently still located there.

82.     Therefore, a reasonable inference is that Defendant was the one responsible for pressuring the Prosecutor to charge Plaintiffs criminally.

83.     John Cecil (an investigator with the Shiawassee County Prosecutor's Office) informed court officer Trooper John Gooch that "Scott (Koerner) did not want to prosecute but he got pressured from Lansing."

84.     After criminal charges were issued, Defendant assisted MSP in releasing a news release and the video of the incident to the public on YouTube.

85.     Several news outlets were publishing articles about the incident, painting Plaintiffs in a negative light.

86.     In response, Plaintiffs received heavy criticism and experienced immeasurable stress due to Defendant's actions.

87.     Plaintiffs experienced relationship problems at home.

88.     Plaintiff Lukas could not seek medical assistance or therapy after he was charged criminally because MSP cut off his health insurance.

89.     Plaintiff Lukas was suspended without pay.

90.     Plaintiff Simpson was suspended with pay.

91.     Plaintiff Simpson's fiancé had a miscarriage during this ordeal.

92.     Plaintiffs all experienced extreme stress, anxiety, mental anguish and brain fog.

93.     While testifying at a court hearing, Plaintiff Simpson had his integrity questioned by an attorney because of the news about him related to this incident.

94.     Plaintiffs faced the possibility of their names being added to a *Brady/Giglio* list as officers who allegedly lied in the course of their duties.

95.     In other words, Plaintiffs have continued to suffer from the emotional distress that comes with worrying they would be labeled criminal, crooked, brutal, and dishonest troopers.

96.     Plaintiffs experienced immeasurable stress, anxiety, and mental anguish due to a lack of certainty on whether they would have all credibility as law enforcement officers destroyed.

97.     On May 22, 2023, Plaintiff Lukas appeared in the 66th District Court for his preliminary examination on count one (Misconduct in Office).

98.     After two days of testimony, the 66th District Court found the Prosecutor had not met his burden of showing probable cause that the felony was committed, and the felony charge against Plaintiff Lukas was dismissed. ***(See PEX Tr. Vol. II, pp 20:23–21:1; Exhibit 2)***

99.     On May 22, 2023, Prosecutor Koerner called the Defendant as a witness at the preliminary examination hearing.

100.    At the preliminary hearing, Defendant testified that after the incident in question, Jacob Long's sister, Tiffany Homola, reached out to her directly through Facebook. ***(See PEX Tr. Vol. I, pp 99:18-24, 107:18-23; Exhibit 1)***

101.    The two were friends on Facebook. ***(See PEX Tr. Vol. I, pp 99:10-17, 107:18-19; Exhibit 1)***

102.    Defendant called Homola directly. *(See PEX Tr. Vol. I, pp 99:20-24, 107:20-23; Exhibit 1)*

103.    Homola informed Defendant that Homola's brother (Jacob Long) was assaulted by several troopers. *(See PEX Tr. Vol. I, pp 99:22–100:19; Exhibit 1)*

104.    Plaintiffs would later discover that Defendant and her ex-husband were close friends with Ms. Homola and her ex-husband, John Homola, and that the four of them used to hang out together socially before each couple divorced.

105.    Defendant then referred Homola to MSP's Professional Standards Section (PSS). *(See PEX Tr. Vol. I, p 100:6-20; Exhibit 1)*

106.    Defendant claimed that she believed she trained Trooper Lukas in MSP's 137th Recruit School. *(See PEX Tr. Vol. I, p 101:10-16; Exhibit 1)*

107.    Defendant further testified that she believed she had trained the defendants on legal issues involved in policing. *(See PEX Tr. Vol. I, p 101:10-22; Exhibit 1)*

108.    Defendant further testified that she provided legal training to the Plaintiffs on the appropriate use of force by police officers. *(See PEX Tr. Vol. I, pp 101:23–102:7; Exhibit 1)*

109.    Defendant reviewed the video from the incident. *(See PEX Tr. Vol. I, p 102:8-17; Exhibit 1)*

110.    Under oath, Defendant professed herself as a de facto expert in defensive tactics, despite never having been recognized as an expert in that area. *(See PEX Tr. Vol. I, pp 103:16–104:13; Exhibit 1)*

111.    Defendant offered her opinion that the kick delivered by Plaintiff Lukas was inconsistent with the Department's training on defensive tactics. *(See PEX Tr. Vol. I, p 105:1-8; Exhibit 1)*

112.    Under oath, Defendant offered her inexpert opinion that the Plaintiffs' encounter with the suspect was a "consensual encounter." *(See PEX Tr. Vol. I, pp 105:10–106:2; Exhibit 1)*

113.    Despite Plaintiff Lukas's statutory authority to enforce the Motor Vehicle Code (MCL 257.662) which requires a headlight be activated on a bicycle while riding on the roadway at dark, Defendant willfully ignored this statute and substituted her personal opinion for the Plaintiffs' professional judgment.

114.    Defendant further offered her legal opinion that Plaintiffs had no basis on which to arrest the suspect, despite the fact that the suspect had refused their commands and fought violently with the Plaintiffs for several minutes. *(See PEX Tr. Vol. I, p 106:6-8; Exhibit 1)*

115.    Defendant deliberately ignored the fact that the suspect (her friend's brother) violently resisted/obstructed/assaulted/battered Plaintiffs and one other trooper because he did not want to follow their lawful commands.

116.    Defendant further ignored the fact that the suspect was found to be in possession of a substantial amount of methamphetamine.

117.    And despite the suspect's commission of several felonies, he was never charged with a single crime.

118.    Although Defendant pushed for the prosecution of Plaintiffs, Defendant did not push the prosecutor to issue criminal charges against her friend's brother, even though they had him on video committing three counts of R+O and one count of Possession or Possession With Intent to Deliver Methamphetamine.

119.    Defendant further offered her legal opinion that the suspect had every right to resist an unlawful arrest, even in situations where the suspect was committing felonies himself. *(See PEX Tr. Vol. I, p 106:3-13; Exhibit 1)*

120.    Defendant testified that she informed the people who were in charge of investigating these types of incidents. *(See PEX Tr. Vol. I, pp 100:22-24, 108:25–109:2; Exhibit 1)*

121.    Defendant admitted she did not write a report herself or conduct any kind of additional investigation. *(See PEX Tr. Vol. I, p 108:9-10, 19-23; Exhibit 1)*

122.    Despite having no authority to conduct a criminal investigation, Defendant conducted her own criminal investigation into Plaintiffs' actions because of her dislike for Plaintiffs.

123.    Defendant never sent the text messages of her conversations with Homola to D/Sgt. Mills, who again was in charge of the criminal investigation. *(See PEX Tr. Vol. I, pp 112:3–113:2; Exhibit 1)*

124.    Defendant testified that she is also the person at MSP who decides what settlements, if any, are going to be offered to someone who sues the Department. *(See PEX Tr. Vol. I, p 117:6-9; Exhibit 1)*

125.    Defendant testified that part of her duties included defending MSP against civil litigation. *(See PEX Tr. Vol. I, pp 98:21–99:3; Exhibit 1)*

126.    Defendant further stated that she did not see it as a conflict of interest for her as the Risk Manager to help fashion a settlement payment for Jacob Long should he sue the Department. *(See PEX Tr. Vol. I, pp 117:23–118:20; Exhibit 1)*

127.    Jacob Long has since sued Plaintiffs and the Department.

128.    At the preliminary hearing, Plaintiff Lukas called Lt. Michael Dillon to the stand.

129.    Lt. Dillon's section received the request for investigation in this matter from PSS.

130.    Lt. Dillon testified that neither he nor his detectives found any evidence that Plaintiff Lukas kicked the suspect in the head (used excessive force). *(See PEX Tr. Vol. II, p 10:8-11; Exhibit 2)*

131.    At the end of the examination, the District Court ruled that probable cause was lacking and the felony charge was dismissed against Plaintiff Lukas. *(See PEX Tr. Vol II, p 20:23–21:1; Exhibit 2)*

132.    But even after the dismissal of the felony, the Plaintiffs continued to face the misdemeanor charges of Assault or Assault and Battery.

133.    On July 6, 2023, Prosecutor Koerner moved to dismiss the remaining charges against the Plaintiffs.

134.    On July 10, 2023, the Judge of the 66th District Court signed the order dismissing all charges against the Plaintiffs.

135.    Additionally, because of the Defendant's malicious actions, Plaintiffs have been subjected to civil litigation in the United States District Court for the Eastern District of Michigan. *See federal docket no. 2:24-cv-11095-RJW-DRG.*

136.    That upon information and belief, Plaintiffs were sued by Jacob Long, who claimed violations of his civil and constitutional rights.

137.    That upon information and belief, in December of 2023, Defendant had been promoted to Lt. Colonel/Deputy Director of the Michigan State Police, making her the number two in command, answering only to the Director/Colonel.

138.    After being promoted from the Risk Management section to the number two in the MSP, Defendant remained intimately and actively engaged in the litigation filed by Jacob Long against Plaintiffs.

139.    That recently, the Defendant, on behalf of MSP, agreed in terms to a settlement with Mr. Long in the amount of $999,999.

140.    That upon information and belief, Defendant recommended that MSP settle with Mr. Long for $999,999 to avoid gubernatorial and legislative review.

141.    Defendant maliciously prosecuted Plaintiffs to humiliate them and enrich her friend's brother.

142.    That Plaintiffs were advised that the case would be settled for a large amount without their input, and MSP would be writing the check to Mr. Long's attorney.

143.    This settlement was announced just four months after the filing of Long's complaint, and less than 60 days after Defendants filed their answers.

144.    Defendant agreed to pay Mr. Long this $999,999 settlement to paint Plaintiffs in a negative light.

145.    Although Defendant pushed for their criminal prosecution, Plaintiffs were never even disciplined by MSP for their actions on the night of August 24, 2022.

## FIRST CLAIM FOR RELEF

### 42 U.S.C. § 1983 Claim for Malicious Prosecution

### Violation of Fourth Amendment Right to Be Free from Arrest and Prosecution Without Probable Cause

146.    All of the foregoing paragraphs are incorporated by reference.

147.    As described in detail above, Defendant Brimacombe instigated, influenced, or participated in the decision to prosecute Plaintiffs, despite knowing that there was no probable cause to support the criminal prosecution.

148.    At all times relevant to the complaint, Defendant was acting under color of law.

149.    The charges were terminated in favor of Plaintiffs.

150.    Defendant accused Plaintiffs of criminal activity despite knowing that those criminal accusations were not supported by probable cause.

151.    While acting under color of law, Defendant leveraged her enormous influence with MSP to bully the prosecuting attorney to charge Plaintiffs with crimes despite his earlier denial of charges.

152.    Defendant's actions were malicious, deliberate, and done in bad faith.

153.    Defendant engaged in arbitrary and malicious conduct that contravened fundamental canons of decency and fairness and violated Plaintiffs' Fourth Amendment right to be free from prosecution where probable cause is lacking.

154.    The Fourth Amendment states, in part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation…."

155.    Yet that is exactly what Defendant did here.

156.    Defendant pushed the prosecutor to issue arrest warrants against Plaintiffs, despite a lack of probable cause that they had committed crimes.

157.    Plaintiffs were merely doing their jobs as MSP troopers.

158.    After Plaintiffs were arraigned on the criminal charges, they continued to suffer from a deprivation of liberty after the initial arrest because the court imposed bail conditions on them that severely restricted their ability to engage in interstate travel.

159.    As a result of Defendant's malicious acts, Plaintiffs were subjected to unnecessary public scrutiny, humiliation, and mental anguish.

160.    Plaintiffs suffered ongoing damage to both their emotional state and their professional reputation as a result of the violations to their Fourth Amendment rights.

161.    Plaintiffs have continued to work for MSP.

162.    As a result of Defendant's malicious acts, Plaintiffs have no confidence in working for MSP.

163.    Every time they start and end their shifts, Plaintiffs now have to worry that Defendant—who has the ability to remotely watch any and all dash cam or body camera videos within minutes of an incident—will be watching their every move and second-guessing every decision they make.

164.    Plaintiffs continue to suffer from nightmares and wonder whether Defendant—who is now the number two commander in the MSP—will continue to target them.

165.    Plaintiffs suffer from fear that they will again be prosecuted, sent to prison, publicly humiliated, and fired from the MSP if they make an honest mistake in the line of duty, or if they exercise their discretion in a way Defendant does not agree with.

166.    Plaintiffs also suffer from worries that the MSP will retaliate against them for filing this complaint by refusing to promote them.

167.    Plaintiffs have no confidence in their ability to promote within the MSP.

168.    Plaintiffs feel like their actions in the line of duty will be under a microscope.

169.    Plaintiffs suffer from the reality of knowing that they may be marked men within the Department.

170.    Hence Plaintiffs can never have confidence that the MSP will support their decisions to enforce the laws because they are walking on eggshells wondering if and when they will be targeted again and maliciously prosecuted by MSP out of spite.

171.    As a direct and proximate cause of Defendant's conduct, Plaintiffs suffered and continue to suffer severe mental anguish and damages as set forth in this Complaint.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiffs Cody Lukas and Justin Simpson request that judgment be entered in their favor and pray that the Court award the following relief:

A.    Compensatory damages in an amount of at least $75,000, to be determined at trial, for the violation of Plaintiffs' constitutional rights;

B.    Punitive damages in an amount to be determined at trial for the willful, wanton, and malicious conduct of Defendant;

C.    Attorney fees and the costs of this action and other costs that may be associated with this action pursuant to 42 U.S.C. Section 1988; and

D.    All other relief which this Honorable Court deems to be in the interests of justice.

**JURY DEMAND**

Plaintiffs demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted:

Dated: February 13, 2025

/s/ Patrick William O'Keefe
Patrick William O'Keefe (P59324)
Nathaniel P. Pfeiffer (P87830)
O'Keefe Law, PLLC
Attorneys for Plaintiffs
7804 Francis Ct., Ste. 210
Lansing, MI 48917
(517) 253-0114
patrick@okeefelaw.net
nathaniel@okeefelaw.net